**In re BAR C CROSS FARMS & RANCHES, INC., a Colorado corporation, Debtor.**

**BAR C CROSS FARMS & RANCHES, INC., a Colorado corporation, and George C. Camilli, Plaintiffs,**

**v.**

**COLORADO–KANSAS GRAIN COMPANY and Western Production Credit Association, Defendants.**

Adv. No. 84 C 902.
Bankruptcy No. 84 B 04260 J.

United States District Court,
D. Colorado.

Feb. 25, 1985.

John C. Eastlack, Colorado Springs, Colo., Trustee, for plaintiffs.

Curt Krechevsky and Jack L. Smith, Holland & Hart, Denver, Colo., for defendants.

## FINDINGS, CONCLUSIONS AND ORDER ON COMPLAINT FOR TURNOVER OF PROPERTY

PATRICIA ANN CLARK, Bankruptcy Judge.

The matter before the Court is the debtor's complaint for the turnover of property. The debtor contends that it is entitled to sole possession of $74,130.76, being the proceeds from the sale of certain wheat. The debtor asserts that Western Production Credit Association released its secured interest in the wheat by signing lien waivers.

Western Production Credit Association (Western) contends that the lien waivers operated merely to subordinate its secured claim to the lien of the federal government and did not constitute a release of its secured interest. Western also argues in the alternative that even if its secured interest was released, the proceeds from the wheat sale belong to it pursuant to the "after acquired property clause" in their security agreement. Finally, Western claims ownership of the proceeds by virtue of the fact that the debtor failed to prove that the proceeds represent wheat specifically referenced in the lien waivers. Colorado-Kansas Grain Company has disclaimed any interest in the disputed funds and has deposited them, together with interest in the amount of $8,500, in the Registry of the Court.

The facts are essentially undisputed. The debtor company is engaged in farming and ranching. Its majority stockholder and president is George Camilli, Sr., who has been a farmer and rancher for over 50 years. Mr. Camilli filed individually for protection under Chapter 11 of the Bankruptcy Code but his case was subsequently consolidated with that of Bar C Cross Farms and Ranches, Inc., the debtor. After its inception Mr. Camilli was joined as a party plaintiff in this action.

Western Production Credit Association is a federally chartered, member-owned, non-profit, credit association whose stated purpose is to provide sound credit to farmers and ranchers. Western has provided loans to the debtor since 1962. The most recent loan was issued for $2,400,000 in 1982 and the debtor's remaining obligation thereunder is approximately $700,000.

The current controversy arose out of a series of transactions between the debtor, Western, and the Commodity Credit Corporation (CCC). In 1980, Western obtained liens on the debtor's crops, livestock and equipment in exchange for a loan for approximately $1,400,000. In particular, Western obtained a first lien security interest on the debtor's 1980 wheat crop grown in Bent and Prowers Counties. Subsequently, the debtor obtained a low interest loan from the CCC and paid the entire loan proceeds of approximately $185,000 to Western. Normally loans from the CCC are equal to the cash market price for the crop and that appears to have been the case with the debtor's 1980 wheat crop.

CCC loans are conditioned on its obtaining a first lien on the commodity securing the loan. Consequently, before it could obtain the CCC loan, the debtor had to obtain lien waivers from Western covering the 1980 wheat crop. Western signed the lien waivers December 10, 1980. The form of lien waiver was provided to the debtor by CCC. A copy of the lien waiver is provided below.

Rec: 262333    Filed Sept.2, 1983, 9:30 A.M. Filed #D-128

**LIEN WAIVER**

U S DEPARTMENT OF AGRICULTURE
Agricultural Stabilization and Conservation Service
Commodity Credit Corporation

| NAME AND MAILING ADDRESS OF PRODUCER | CROP YEAR | COMMODITY | | STATE & CO. CODE | LOAN NO. |
|---|---|---|---|---|---|
| F1214   BAR C CROSS FARMS RT 4 LAS ANIMAS, CO. 81054 | 1980 | WHT | | 08  011  0 | 8 |

| | WHERE PRODUCED | | |
|---|---|---|---|
| | FARM NO. | COUNTY | STATE |
| | F1214 | BENT | COLORADO |

The undersigned holder of a lien on the above described commodity does hereby waive, relinquish and surrender all right, title, and interest in and to said commodity in order that the producer may obtain a loan upon the security thereof, or sell the commodity to Commodity Credit Corporation under the price support program and (lienholder check appropriate statement):

(1) [X]  Authorize the payment to the producer or persons designated by him of the proceeds of such loan or sale.

(2) [ ]  Authorize the loan proceeds to be disbursed jointly to the producer and the undersigned lienholder.

NAME AND ADDRESS OF LIENHOLDER OR AUTHORIZED AGENT
WESTERN CREDIT PRODUCTION ASSOCAITON
BX 358
GUYMON, OK.  73942

*[handwritten note] ...This is original copy not an ... copy signature AD*

SIGNATURE  *Randy Meyer, Credit Officer*    DATE  12/10/80

COUNTY OFFICE COPY

The debtor's 1980 CCC loan was due in 1984. The debtor elected to repay the loan early and consequently became the beneficiary of a government rebate program whereby 20 percent of the wheat tendered to the CCC as payment was returned to the debtor. It is the proceeds from this rebated grain that are the subject of this controversy.

Later a similar scenario developed with regard to the debtor's 1983 wheat crop. Western had a first lien security interest in the 1983 wheat crop when the debtor applied for another CCC loan. Western executed a lien waiver on the 1983 wheat crop, which was similar to the 1980 lien waiver. However, unlike the prior loan, the parties agreed that Western would receive only a portion of the CCC loan proceeds. The debtor paid Western $11,571.53 and used the remaining $27,995.01 to cover expenses for raising the crop.

The debtor delivered the 1983 wheat crop, plus the rebated 1980 grain to Colorado-Kansas Grain Company in November of 1983 and the beginning of 1984. The proceeds from the sale of both of the foregoing totalled $114,689.46. The debtor directed that $39,566.54 go to the CCC to pay off the 1983 loan in full and that the remainder go to the debtor. Western intervened and advised Colorado-Kansas Grain Company that it retained a perfected lien on the debtor's 1983 crops, including 40,000 bushels of wheat on hand. Western demanded that all sales proceeds be made payable jointly to the debtor and to Western.

Colorado-Kansas Grain Company refused to pay either of the claimants. Finally in July of 1984 Colorado-Kansas Grain Company paid the CCC the $39,566.54 covering the debtor's loan obligation, however, $3,044.81 in interest had accrued in the interim. Mr. Camilli testified that he paid the accrued interest from his own funds.

Western bases its claim for the wheat crop proceeds on three legal arguments. First, Western contends that the lien waivers operate merely to subordinate Western's interest to that of CCC, and not to permanently cancel its secured interest. Thus, once the government's loan obligation was satisfied, Western's first lien status was reinstated. As support, Western asserts that the normal statutory procedure for releasing a security interest in favor of the debtor was not followed here. However, Western's interpretation of the

lien waiver is contrary to the plain meaning of the instrument.

■ General rules of construction require that an instrument be enforced as written when it is complete, clear in its terms, and free from ambiguity. *Radiology Professional Corp. v. Trinidad Area Health Ass'n., Inc.*, 195 Colo. 253, 577 P.2d 748 (1978). Such an instrument is then said to express the intention of the parties and strained construction must not be employed, nor extrinsic evidence permitted in modification thereof. *American Mining Co. v. Himrod-Kimball Mines Co.*, 124 Colo. 186, 235 P.2d 804 (1951). The pertinent language in the lien waivers provides in part,

The undersigned holder of a lien on the above described commodity does hereby waive, relinquish, and surrender *all* right, title and interest in and to said commodity.... (emphasis added).

The plain and generally accepted meaning of a waiver, relinquishment or surrender of all right, title and interest is that absolutely no right, title or interest remain.

■ It strains principles of construction to assert that a subordination agreement was created where subordination is neither expressly mentioned nor alluded to. The fact that the purpose behind the lien waivers was to allow the debtor to secure a CCC loan, and the CCC merely required a first lien position, does not create a prince where otherwise a frog exists. "In construing a document, courts may not rewrite the provisions thereof, but must enforce an unambiguous contract in accordance with its terms." *Griffin v. United Bank of Denver*, 198 Colo. 239, 599 P.2d 866 (1979). Nor does a mere disagreement between the parties as to the interpretation of an agreement, in itself, create an ambiguity. *Union Rural Electric Ass'n., Inc. v. Public Utilities Commission*, 661 P.2d 247 (Colo. 1983).

■ Western buttresses its claim that the lien waiver is not the equivalent of a permanent release of collateral by arguing that the applicable Colorado Uniform Commercial Code requirements were not satisfied. Section 4–9–406, C.R.S., provides as follows:

The statement of release is sufficient if it contains a description of the collateral being released, the name and address of the debtor, the name and address of the secured party, and the file number of the financing statement.

Section 4–9–406, C.R.S.

Although the lien waivers did not contain the file number of the financing statements, it is not a prerequisite to releasing collateral. The official comment to Section 4–9–406, C.R.S., reveals that the filing contemplated by this section is not mandatory. It provides, "[t]here is no requirement that such a statement be filed when collateral is released.... It is merely a method of making the record reflect the true state of affairs so that fewer inquiries will have to be made by persons who consult the files." Section 4–9–406, C.R.S. (Official Comments). Thus, it is clear that the omission of the financing statement number does not alter the legal effect of the lien waivers.

■ Western also argues that even if the lien waivers are interpreted as canceling Western's security interest, once the CCC's loan obligation was satisfied, the "after acquired property clause," contained in the security agreement signed by the debtor, operates to re-attach Western's security interest. However, an "after acquired property clause" is inapplicable to the proceeds of previously released collateral because there is no longer a foundation upon which the after acquired security interest may attach. The purpose of an after acquired security clause is to maintain the continuity of a secured interest even though the collateral may change form. When the secured interest has been relinquished, the chain is broken and the proceeds of the collateral are also released. Therefore, Western's secured interest cannot re-attach itself to the proceeds of the wheat crop after its secured interest in the wheat has been cancelled.

■ Finally, the Court is persuaded that the debtor adequately bore his burden of proving that the proceeds represent wheat specifically covered by the lien waivers. The testimony of Mr. Camilli and the documents reflect an uninterrupted account of the wheat grown in Bent County for the crop year of 1980. Nor was any evidence presented that the proceeds represented either wheat grown in other locations or in other crop years. Therefore, the Court finds that the proceeds represent the wheat which was specifically covered by the lien waivers.

ORDERED that the debtor's request is granted for turnover of the sum of $74,130.76 plus $8,500 accrued interest plus any interest earned on these sums while in the Registry of this Court and for costs of this action.

FURTHER ORDERED that the parties shall have 10 days from the date this Order becomes final to file a written request for the withdrawal of all exhibits received in evidence, after which time the exhibits will be destroyed by the Clerk without further order of the Court.